Filed 8/20/13

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E048880 |
| v. | (Super.Ct.No. RIC329441) |
| VINH NGUYEN, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. David A. Gunn, Judge. Affirmed.

Chris Truax, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Barry Carlton, and Bradley A. Weinreb, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant, Vinh Nguyen, was found to be a sexually violent predator (SVP), and committed to the Department of Mental Health (DMH) for an indeterminate term

1

following a petition for recommitment under the Sexually Violent Predators Act (SVPA). (Welf. & Inst. Code,[1] § 6600, et seq.) He appealed the judgment and civil commitment on the grounds that (1) the trial court erred in allowing defendant's counsel to waive defendant's presence at trial, and (2) the indeterminate term for SVP's violates state and federal guarantees of equal protection. We affirmed the commitment order and defendant petitioned for review in the California Supreme Court. On August 10, 2011, the Supreme Court retransferred the case to our court with directions to vacate the decision and suspend further proceedings pending finality of the proceedings on remand in *People v. McKee* (2010) 47 Cal.4th 1172 (*McKee I*).

Following proceedings on remand, the Fourth District Court of Appeal, Division One, issued its opinion in *People v. McKee* (2012) 207 Cal.App.4th 1325 (*McKee II*). The California Supreme Court denied review of *McKee II*. We lifted the stay and invited the parties to submit supplemental letter briefs in light of *McKee II*. Both Nguyen and the People have filed letter briefs. We again affirm.

BACKGROUND

On or about November 18, 2005, the People filed a petition to recommit defendant as a SVP.[2] Due to delays, a subsequent petition for recommitment was filed on January

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] Minute orders and an order following the probable cause hearing pertaining to this petition are in the clerk's transcript, but the petition itself is not included in the record on appeal. The January 17, 2008, petition is in the clerk's transcript. The trial proceedings related to the November 2005 petition, resulting in a true finding on that petition, and a dismissal of the January 2008 petition on the grounds it was moot.

17, 2008, prior to trial on the 2005 petition. On July 13, 2009, following a bench trial on the 2005 petition for recommitment, the trial court made a true finding that defendant remained a SVP. Defendant was not present at the trial; his counsel informed the court that his presence was waived. Defendant was committed to the DMH for an indeterminate term, and the 2008 petition was dismissed as moot. Defendant timely appealed.

DISCUSSION

**1.      Defendant's Absence at the Trial Was Harmless Beyond A Reasonable Doubt.**

Defendant claims his due process rights were violated when the trial on his recommitment petition was conducted in his absence, without a personal waiver of the right to be present from the defendant, after his attorney informed the court that defendant waived his right to be present. We begin with some background helpful to our analysis.

**a.      Procedural Backdrop**

Of the approximately 37 hearings conducted between March 2006 and the date of the trial, defendant was transported to court once, inadvertently, on March 10, 2009, for the hearing on his motion to dismiss the recommitment petition. At that hearing, defendant's counsel explained that because of the inadvertent transportation of defendant to the hearing, he risked losing his bed at Coalinga State Hospital. After the court denied the motion to dismiss the recommitment petition, the court set a new hearing date for the trial and the prosecutor inquired if defendant wanted to be present. Defendant responded,

3

through his attorney, that he wanted to be present. The court ordered that defendant be transported back to court for the trial, which was set for May 4, 2009.

Because the minutes of the May 4, 2009, hearing are ambiguous as to defendant's presence, we augmented the record on our own motion to obtain the reporter's transcript of that hearing. The supplemental reporter's transcript reveals that defendant was not transported for the hearing, and his attorney represented that defendant waived his presence. In addition, counsel informed the court that defendant's presence at his trial was waived, and that defendant likely would waive his right to a jury trial. A new date was selected for a trial readiness conference, June 18, 2009, and the court directed that "Defendant is to remain housed in Coalinga State Hospital."

On June 4, 2009, defendant filed a motion to continue the trial on the ground that defense counsel was in trial on another case. In the motion, defense counsel indicated defendant "has waived his presence at trial and waived a jury." On June 8, 2009, the court heard the motion to continue. The minutes are unclear as to whether defendant appeared, but we infer he did not because the record does not include a transportation order for that date and the minutes reflect that defendant was to remain housed at Coalinga State Hospital.

The matter was called for court trial on June 13, 2009, in defendant's absence. Defendant claims he is entitled to a reversal because his due process rights were violated by proceeding in his absence without a personal waiver of his presence. We disagree.

4

**b.** **Analysis**

The SVPA provides for the involuntary civil commitment of certain offenders, following the completion of their prison terms, who are found to be SVP's. An "SVP" is a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior. (§ 6600, subd. (a)(1).) Certain enumerated sex crimes constitute a sexually violent offense within the meaning of the SVPA, including a violation of Penal Code section 288, subdivision (a), when committed by force, violence, duress, menace, or fear of immediate unlawful bodily injury of the victim or another person. (§ 6600, subd. (b).)

SVPA proceedings have a nonpunitive purpose. (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1144.) The act provides treatment for mental disorders from which SVP's currently suffer to reduce the threat of harm otherwise posed to the public. (*Id.* at pp. 1143-1144; *People v. Otto* (2001) 26 Cal.4th 200, 205.) However, because a civil commitment involves a significant deprivation of liberty, a defendant in an SVP proceeding is entitled to due process protections. (*Otto,* at p. 209; *Foucha v. Louisiana* (1992) 504 U.S. 71, 80 [112 S.Ct. 1780, 118 L.Ed.2d 437]; see also *People v. Carlin* (2007) 150 Cal.App.4th 322, 340.)

To this end, section 6603 provides certain procedural rights, entitling the person to a trial by jury, the assistance of counsel, the right to retain experts or professional persons

5

to perform an examination on his or her behalf, and to have access to all relevant medical and psychological records and reports.  (§ 6603, subd. (a).)

In arguing that defendant has a statutory right to be present at the SVP recommitment proceeding, defendant relies on section 6605.  However, that section applies to proceedings related to a petition for conditional release.  (§ 6605, subd. (b).) When the DMH determines that the person's condition has so changed that the person no longer qualifies as an SVP, or where it determines that conditional release to a less restrictive alternative is in the best interest of the person, the director may authorize the person to file a petition for conditional release.  Upon receipt of that petition, the court shall order a show-cause hearing at which the court can consider the petition and any documentation provided by the medical director, the prosecutor, or the committed person. (§ 6605, subd. (b).)  At that show-cause hearing, the committed person "shall have the right to be present and shall be entitled to the benefit of all the constitutional protections that were afforded to him or her at the initial commitment proceeding."  (§ 6605, subd. (d).)

The instant proceeding was not related to a petition for conditional release, so the provisions of section 6605 are inapplicable.  The right to be present at a recommitment hearing is not a statutorily guaranteed right under the SVPA.

Next, defendant asserts he has a constitutional due process right to be present at the hearing, relying on *In re Watson* (1979) 91 Cal.App.3d 455, and *People v. Fisher* (2009) 172 Cal.App.4th 1006.  The court in *Fisher* noted that an MDO (mentally disordered offender) proceeding is civil, rather than criminal, and did not implicate all of

6

the constitutional and procedural safeguards afforded to criminal defendants. (*Fisher,* at p. 1013.) However, relying on *Watson, supra,* the court determined that in civil commitment proceedings, due process guarantees the right to be present during the presentation of evidence absent a personal waiver or demonstrated inability to attend. (*Fisher*, citing *Watson*, at pp. 461-462.)

The People argue that a party to a civil case does not have an absolute right to be personally present. (Citing *Yarbrough v. Superior Court* (1985) 39 Cal.3d 197, 203-204; *Payne v. Superior Court* (1976) 17 Cal.3d 908, 913; and *Arnett v. Office of Admin. Hearings* (1996) 49 Cal.App.4th 332, 338.) These cases involved incarcerated persons who were sued for civil damages and sought access to the courts to defend those actions. We agree that parties in civil actions do not have an absolute right to be personally present. However, an SVP proceeding is a special proceeding of a civil nature and not a civil action. (See *People v. Yartz* (2005) 37 Cal.4th 529, 536-537.) Given the significant deprivation of liberty resulting from an indeterminate commitment following an SVP determination, notwithstanding the lack of an express statutory right to be present at SVP proceedings, we agree with *Fisher* and *Watson* that the defendant had a due process right to be present at the trial.

The next question is whether defendant's counsel had authority to waive his presence. Defendant argues that counsel lacked the authority to waive his right to be personally present, relying on *In re Watson, supra,* 91 Cal.App.3d at pages 461-462, and *People v. Fisher, supra,* 172 Cal.App.4th at page 1014. The People argue that counsel may waive the committee's right to be present and to make other procedural decisions

7

over the committee's objection. (*People v. Masterson* (1994) 8 Cal.4th 965, 969, 971 [holding that counsel may waive jury trial over the client's objection].) However, the conclusion in *Masterson* was driven, in part, by the recognition that in proceedings to determine competency to stand trial in a criminal case (ref. Pen. Code, § 1368, et seq.), it is presumed that the person whose competence is in question cannot be entrusted to make basic decisions regarding the conduct of that proceeding. (*Masterson,* at p. 974.) Civil commitments under the SVPA do not necessarily involve individuals whose competence is in question, so we cannot extend the holding of *Masterson* to the situation before us.

The right to be present in a conservatorship proceeding is a statutory right, which appointed counsel has authority to waive. (*Conservatorship of John L.* (2010) 48 Cal.4th 131, 148.) In that case, the defendant informed his appointed attorney that he did not want to contest the conservatorship or to be present in court, and his appointed attorney relayed that information to the trial court. (*Id.* at p. 149.) The Supreme Court held that "in the absence of any contrary indication, the superior court may assume that an attorney is competent and fully communicates with the proposed conservatee about the entire proceeding," and that counsel was authorized to waive the conservatee's presence. (*Id.* at p. 156.)

The present case stands on slightly different footing because (a) we have concluded that an SVP committee has a due process right to be present, and (b) there is conflicting evidence in the record: on March 10, 2009, defendant, who was personally present, requested to be present at the hearing; on May 4, 2009, defendant was absent and his counsel informed the court he did not wish to be present. Aside from these

8

distinguishing facts, the holding of *Conservatorship of John L.* must be considered in light of the fact that conservatorships are of limited duration (Pen. Code, § 1370, subd. (c)(1) [no more than three years]; Welf. & Inst. Code, § 5361[one year]), while SVP commitments are indeterminate in duration. We cannot extend the holding of that case to this.

There are no cases on point. However, an attorney for a person who is the subject of a civil commitment petition for being mentally retarded and dangerous to self or others (§ 6500) has been held to lack the authority to waive the prospective committee's right to be present at the hearing, over the committee's objection. (*People v. Wilkinson* (2010) 185 Cal.App.4th 543.) The reviewing court in the *Wilkinson* case observed, citing *People v. Masterson, supra,* 8 Cal.4th at page 974, that counsel may waive his or her client's right to a jury trial, even over the objections of the client, but held that "it does not necessarily follow that an attorney may waive all of a client's rights." (*Wilkinson,* at p. 551.) *Wilkinson* was decided four months after the Supreme Court issued the opinion in *Conservatorship of John L.,* but made no mention of the case, perhaps because the *Wilkinson* involved a client who expressed a desire to attend the hearing.

Based on the weight of authority (*Wilkinson*, *Watson*, and *Fisher),* we agree that counsel does not have authority to waive his or her client's right to attend the hearing that may result in an indeterminate commitment over the client's objection. The next question is whether the error requires reversal. In a civil commitment proceeding, we use the *Chapman* test (*Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705]) to review federal constitutional error. (*People v. Fisher, supra*, 172 Cal.App.4th at

9

p. 1014.)  Reversal is required unless the error is harmless beyond a reasonable doubt. (*Chapman,* at p. 24; *Fisher,* at p. 1014.)

The error here was harmless beyond a reasonable doubt.  For the vast majority of the hearings in this case, the defendant was unwilling to participate in the proceedings, going so far as to personally request a continuance in writing so that he could maintain his position in a vocational training program.  At every hearing except for the single hearing in March 2009, at which he personally appeared, and, for the first time, indicated his desire to attend his trial, defendant's presence had been waived by counsel, and defendant never objected, as the committee in *Wilkinson* did.  To the contrary, there are strong indications that defendant did not want to participate in the trial.  This was again reflected on the ultimate day of trial, when counsel informed the court that he had met with defendant in March 2009 and had communicated with defendant since that date, and that defendant waived both his presence at trial and his right to be tried by a jury.

Thus, while the evidence is not undisputed, there is no indication that defendant objected to his attorney's waiver of his presence, or that he desired to be present on July 13, 2009, for his trial.  To the contrary, the record reflects there was communication between defendant and his counsel *after* he requested to be present, in which he withdrew that request.  If, as counsel represented, defendant had no desire to be present, then any error would be harmless beyond a reasonable doubt.  In the absence of a contrary indication, the superior court (and this court) may assume that an attorney is competent and fully communicated with the proposed committee about the entire proceeding. (*Conservatorship of John L., supra,* 48 Cal.4th at p. 156.)

10

Additionally, at trial, defense counsel thoroughly cross-examined the prosecution experts and presented a defense expert who disagreed with the pedophilia diagnosis of the other experts who had evaluated defendant. (See *People v. Fisher, supra,* 172 Cal.App.4th at p. 1014.) The undisputed evidence was that defendant refused to participate in treatment despite the many years he has been committed.[3]

At oral argument defendant's appellate counsel argued that the "unknown unknowns" of what input defendant could have provided to his trial attorney if he had been present required reversal. He argued that where the record is silent as to how the defendant's presence would have affected the case, reversal is required. However, appellate counsel acknowledged that defendant could only clarify historical facts about his personal background and would not likely have affected the expert opinions presented at trial to his advantage.[4] Reversal is not compelled. Details of defendant's personal background have been reported numerous times through several SVP proceedings, without any objection or challenge. Unless his past history has changed, there are no "unknown unknowns" defendant's presence could have elucidated.

Additionally, despite defendant's absence, his trial attorney capably presented expert evidence on the core issue to be determined in the proceedings: whether defendant was a pedophile who is a danger to others in that he is likely engage in sexually violent criminal offenses. Moreover, counsel represented to the court that defendant did not wish

---

[3] Defendant was evaluated for an SVP commitment in 1999, and for recommitment in 2002, 2003 and 2005.

[4] There are serious risks inherent in having defendant testify, thereby exposing him to cross-examination.

to be present for the trial, which compels the conclusion that reversal for a new hearing, which he is likely to refuse to attend (given the overwhelming number of hearings for which he waived his presence) is unnecessary. Further, in the years since defendant was first committed as an SVP, defendant has refused to participate in therapy or treatment to address his diagnosis. He had little to offer the court in his defense on the issue of his likelihood of committing future sexually violent criminal offenses, had he appeared.

Most importantly, contrary to the defense expert's opinion that defendant was not a pedophile, there was evidence beyond a reasonable doubt that he met the diagnostic criteria for pedophilia. The evidence supporting defendant's diagnosis was convincing under any standard. Dr. Marianne Davis conducted more than one evaluation of defendant and found that defendant met the criteria for a diagnosis of pedophilia. She also testified that defendant was evaluated by four different doctors in 1999 and all four agreed on the diagnosis of pedophilia. Since that time, defendant has been reevaluated on a continuous basis and the diagnosis of pedophilia has been consistently given. Dr. Davis further testified that defendant had been offered sex offender treatment but had not completed Phase I. Based on assessments (Static-99, Static-2002, and MnSOST-R), Dr. Davis determined defendant posed a serious and well-founded risk of engaging in sexually violent predatory behavior.

A defense expert, Dr. Raymond Anderson, testified that there was insufficient evidence to support a conclusion defendant was a pedophile because there was no evidence that defendant had an internal drive or fixation, or strong and persistent urges to commit sex offenses against children. The defense expert also testified on his behalf that

12

defendant's age affected his level of risk, insofar as a 45 year old would repeat an offense less frequently than a 35 year old. There is no possibility that defendant's presence at the hearing would have made a difference.

Despite the opinion of Dr. Anderson that defendant was not a pedophile, the court was familiar with the numerous evaluations of defendant since his initial SVP commitment, and the fact that all experts concurred in the diagnosis of pedophilia. Further, evidence contained in the expert evaluations considered by the prosecution's expert and contained in the court's file supported an inference that defendant *did* respond to an internal drive or urge to commit sex offenses against children, contrary to Dr. Anderson's conclusion. In 1989 he violated parole two times by having prohibited contact with children, near a school, despite being expressly prohibited from doing so. The fact he continued to follow a young boy to school after being warned off by his parole officer supports an inference that he suffers from a strong and persistent urge to commit sex offenses against children.

Thus, notwithstanding the defense expert's opinion that defendant did not meet the diagnostic criteria for pedophilia, this was not the type of dispute that affected the reliability of the proceeding to the degree that defendant's presence would have made a difference. (See *People v. Wilkinson, supra,* 185 Cal.App.4th at pp. 551-552.) Thus, even though defendant did not personally waive his right to be personally present, any error was harmless beyond a reasonable doubt. (*Chapman v. California, supra,* 386 U.S. at p. 24.)

## 2. Disparate Treatment For SVP's Is Rational.

Defendant argues that the indeterminate commitment provisions of the SVPA violated federal guarantees of equal protection. Following the decision in *McKee I, supra,* 47 Cal.4th 1172, which found that SVP's and MDO's are similarly situated, the Supreme Court directed that we vacate our opinion pending resolution of that case following a remand to the trial court. *McKee II*, *supra,* 207 Cal.App.4th 1325, was subsequently decided, and is final. That case held that the medical and scientific evidence presented on remand justified the disparate treatment of SVP's. (*Id.* at p. 1347.) We requested supplemental briefing following *McKee II*. Defendant now argues that *McKee II* was badly reasoned and urges us to apply a strict scrutiny test. We have done so, and we disagree.

The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment. The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner. This initial inquiry is not whether persons are similarly situated for all purposes, but whether they are similarly situated for purposes of the law challenged. (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.) Neither the Fourteenth Amendment of the Constitution of the United States nor the California Constitution precludes classification by the Legislature or requires uniform operation of the law with respect to persons who are different. (*People v. Guzman* (2005) 35 Cal.4th 577, 591.) A strict scrutiny standard is used to measure

14

claims of disparate treatment in civil commitments.  (*People v. Green* (2000) 79 Cal.App.4th 921, 924.)  The strict scrutiny standard requires the state to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest.  (*Plyler v. Doe* (1982) 457 U.S. 202, 217 [72 L.Ed.2d 786, 102 S.Ct. 2382].)

In *McKee I, supra,* 47 Cal.4th 1172, the California Supreme Court observed that while persons committed as MDO's (Pen. Code, § 2962) and SVP's do not share identical characteristics, they are similarly situated for the purpose of determining why one group received an indefinite commitment and had the burden of proving they should not be committed, while the other group was subject to short-term commitment renewable only if the People periodically proved that continuing commitment was justified.  (*McKee I,* at p. 1203.)

However, the Supreme Court did not hold, as a matter of law, that there was no justification for different treatment for SVP's and MDO's.  Instead, it ordered a remand to give the People the opportunity to demonstrate a constitutional justification for the differential treatment.  (*McKee I, supra,* 47 Cal.4th at pp. 1208-1209.)  Following remand, the reviewing court held that the evidence presented by the People justified the disparate treatment of SVP's for several discreet reasons.  (*McKee II, supra,* 207 Cal.App.4th at p. 1347.)  Those reasons relate to recidivism, the greater trauma suffered by victims of sexual abuse, and diagnostic and treatment differences between SVP's and other mentally disordered offenders.

15

### a.    Recidivism

The evidence under consideration in *McKee II* demonstrated that the inherent nature of the SVP's mental disorder makes recidivism significantly more likely for SVP's as a class than for MDO's or NGI's (not guilty by reason of insanity).  (*McKee II, supra,* 207 Cal.App.4th at p. 1340, citing *McKee I, supra,* 47 Cal.4th at p. 1208.)  In our original opinion, we observed that SVP's represent a very small number of dangerous people that have committed certain specified crimes and suffer a certain type of mental illness predisposing them to commit sexually violent offenses.  As our Supreme Court stated in *Cooley v. Superior Court, supra*, 29 Cal.4th at page 253, the SVP Act "narrowly targets 'a small but extremely dangerous group of [SVP']s . . . .'"  SVP's diagnosed as pedophiles pose a greater risk of reoffending.  Studies of sex offenders suggest that sexual offending may be different from other types of crime:  Although sexual offenders may commit nonsexual crimes, nonsexual criminals rarely recidivate with sexual offenses.  (R. Karl Hanson and Monique T. Bussière, *Predicting Relapse:  A Meta-Analysis of Sexual Offender Recidivism Studies,* 66 J. of Consulting & Clin. Psychol., pp. 348-362 [No. 2, 1998].)  In this respect, MDO's differ from SVP's in that they are less likely to commit a sexually violent offense upon release from custody.

By definition, as SVP is a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is *likely that he or she will engage in sexually violent criminal behavior.*  (§ 6600, subd. (a)(1), italics added.)  A "diagnosed mental disorder" includes a congenital or acquired condition affecting the

16

emotional or volitional capacity that *predisposes the person the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others.* (§ 6600, subd. (c), italics added.) Thus, an SVP's mental disorder predisposes him or her to commit a sexual offense.

Further, as Dr. Davis testified in the present case, certain classes of persons diagnosed with pedophilia, namely, homosexual nonrelated offenders such as defendant, have the highest rate for repeated offending compared with other sex offenders. She also testified that because SVP's are a special group of sexual offenders, the policy of the law is to corral them, keeping them away from society. This is due in part to the complex and often compulsive nature of the disorder. (Hall and Hall, *A Profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues,* 82 Mayo Clinical Proceedings. 457, 467, 469 (Apr. 2007, vol. 4).) Several studies have failed to find any convincing evidence that treatment is effective in reducing recidivism of sexual offenses. (Grossman et al., *Are Sex Offenders Treatable? A Research Overview*, 50 Psychiatric Services 349, 356-357 (Mar. 1999).)

Whereas an SVP's mental disorder must predispose the person to commit criminal sex acts (§ 6600, subd. (c)), no comparable showing is required for an MDO. For MDO's, the prisoner with the "severe mental disorder" (an illness or disease or condition that substantially impairs the person's thought, perception of reality, emotional process, or judgment, or which grossly impairs behavior, or that demonstrates evidence of an acute brain syndrome [Pen. Code, § 2962, subd. (a)]) must be found to represent "a substantial danger of physical harm to others." (Pen. Code, § 2962, subd. (d)(1).) No

17

recent overt act must be proven to demonstrate that the prospective MDO constitutes a "substantial danger of physical harm." (Pen. Code, § 2962, subd. (f).)

Further, by statutory implication, an MDO must be found to be amenable to treatment. (Pen. Code, § 2962, subd. (d)(1) ["... prisoner cannot be kept in remission without treatment . . ."].) Amenability to treatment is not required for an SVP, nor is it required for treatment of that person. (§ 6606, subd. (b).)

SVP's are thus a subset of prisoners with severe mental disorders, who are predisposed to commit acts of sexual violence by virtue of their mental disorder, having been convicted of a violent sexual offense previously, and who have a higher likelihood of reoffending, as opposed to MDO's, who represent a substantial danger of physical harm to others due to a severe mental disorder, without having to prove an overt act. The SVPA thus requires proof of more than a mere predisposition to violence; it requires evidence of past sexually violent behavior and a present mental condition that creates a likelihood of such conduct in the future if the person is not incapacitated. (*Kansas v. Hendricks* (1997) 521 U.S. 346, 357 [117 S.Ct. 2072, 138 L.Ed.2d 501].)

b.      **Greater Trauma of Victims of Sexual Offenses**

*McKee II* observed that the People had established that victims of sex offenses suffer unique, and in general, greater trauma than victims of nonsex cases. (*McKee II, supra,* 207 Cal.App.4th at p. 1342.) The Court of Appeal concluded that the expert testimony supported a reasonable perception that the harm caused by sexual abuse is, in general, a greater harm than the harm caused by other offenses and therefore deserves more protection. (*Id.* at pp. 1343-1344.) We agree.

18

### c.    Diagnostic and Treatment Differences

In *McKee II,* the expert testimony presented on remand demonstrated that while

MDO's and NGI's may have major mental illnesses, only 2 percent of MDO's and NGI's

suffer from pedophilia or other paraphilias, as compared with nearly 90 percent of SVP's.

(*McKee II, supra,* 207 Cal.App.4th at p. 1344.)  The experts also explained that the

treatment plans for SVP's are different from those of MDO's and NGI's, because they

are not based on medications, but rather on giving them tools to limit their risk of

sexually reoffending.  (*Id.* at p. 1345.)  The evidence showed that only about 25 percent

of SVP's participate in treatment, such that many SVP's took up to five years to complete

treatment.  (*Ibid.*)  The need for indeterminate commitments was based on the finding

that two-year commitments were inadequate to complete treatment.  (*Id* at p. 1346.)  The

reviewing court concluded this evidence supported the conclusion that SVP's are

clinically distinct  from MDO's and NGI's.  (*Id.* at p. 1347.)

The evidence presented in this case similarly showed that SVP's have a poor

prognosis for successful treatment.  Here, the trial court heard evidence that SVP

treatment has a minimal rate of success.  Dr. Davis testified that approximately 550

SVP's had been committed for treatment.[5]  Of that number, only 15 or 16 persons have

completed the treatment program.  At trial, defense counsel argued to the court that this

---

[5]  According to DMH statistics, as of July 1, 2010, 699 patients have been committed to the SVP treatment program.  (Task Force Report of the Sex Offender Commitment Program, http://www.casomb.or/docs/csom%20full%20report.pdf [as of August 20, 2013].)

statistic rendered the program of treatment a "joke." The probability of successfully completing sex offender treatment is thus 2.9 percent (16 divided by 550[6]).

In other words, the SVPA targets persons with mental disorders that may never be successfully treated. (*People v. Hubbart* (2001) 88 Cal.App.4th 1202, 1222.) The probability that defendant would reoffend by committing a new sexually violent crime was estimated in the medium-high range. Defendant's scores on the Static-99 instrument[7] place him in the 7.7 to 19.1 percent risk of reoffending within five years, and 8.2 to 27.3 percent risk of reoffending within 10 years. Because defendant has refused to participate in his own treatment for the bulk of his past commitments, the probability of his successful completion of sex offender treatment is further reduced.

In the wake of *McKee II,* several other courts have had the opportunity to consider the question of whether disparate treatment for SVP's is warranted and have concluded that it is. (See *People v. McDonald* (2013) 214 Cal.App.4th 1367, 1372; *People v. Landau* (2013) 214 Cal.App.4th 1, 47; *People v. McCloud* (2013) 213 Cal.App.4th 1076, 1086; *People v. McKnight* (2012) 212 Cal.App.4th 860, 862.) Based on the ample authorities, as well as the evidence presented at trial in this case, we conclude the disparate treatment for SVP's as a class does not offend equal protection principles. Because the statutory scheme has been precisely tailored to serve a compelling

---

[6] Although statistics to date show the number of persons who have been committed as SVP's, we were unable to find more current statistics on the successful treatment of SVP's, leading to release. We therefore use the figures provided by Dr. Davis's testimony.

[7] Dr. Davis described the Static-99 is an actuarial instrument used to distinguish between recidivists and nonrecidivists.

governmental interest in protecting the public against SVP's, it passes constitutional muster.

## DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PUBLICATION

RAMIREZ
P. J.

We concur:

McKINSTER
J.

RICHLI
J.

21